The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
August 23, 2018

## 2018COA120

**No. 15CA0526, *People v. Richardson* — Criminal Law —
Structural Error Doctrine — Juries — Challenge of Jurors for
Cause; Criminal Procedure — Substitution of Judges; Judges —
Code of Judicial Conduct — Promoting Confidence in the
Judiciary**

A division of the court of appeals considers whether it is error

warranting reversal for a judge to preside over a case in which his

spouse is a juror and to allow his spouse to remain on the jury

when no objection was raised to the spouse's jury service at trial.

The majority concludes that, even if there was error here, the

defendant at least forfeited the right to a jury free of the presiding

judge's spouse by failing to object at trial, and the division reaches

the merits of the defendant's argument because plain errors can be

reviewed on appeal.

In *Weaver v. Massachusetts*, 582 U.S. ___, 137 S. Ct. 1899, 1908 (2017), the Supreme Court identified three broad rationales for recognizing structural error: (1) the right "is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) the error's effects are too hard to measure; and (3) "the error always results in fundamental unfairness." On the record before it, the majority cannot conclude that these rationales are implicated here. Even so, the division concludes that the spouse's presence on the jury did not amount to plain error because the defendant cannot point to any concrete record evidence that the spouse's service created undue prejudice to the defendant.

Finally, the majority concludes that the plain language of section 16-10-103, C.R.S. 2017, Crim. P. 24(b)(1), and C.J.C. 1.2 did not require the judge to sua sponte recuse himself from this case.

Accordingly, the majority affirms the judgment of conviction.

The partial dissent asserts that it was structural error for the judge to be in a spousal relationship with an empaneled juror and would reverse the judgment of conviction.

Court of Appeals No. 15CA0526
Adams County District Court No. 13CR3497
Honorable Thomas R. Ensor, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gary Val Richardson,

Defendant-Appellant.

## JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE FOX
Carparelli*, J., specially concurs
Furman, J., concurs in part and dissents in part

Announced August 23, 2018

Cynthia H. Coffman, Attorney General, Paul E. Koehler, First Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Nicole M. Mooney, Alternate Defense Counsel, Denver, Colorado, for Defendant-
Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2017.

¶ 1     Gary Val Richardson appeals the judgment of conviction entered on jury verdicts finding him guilty of possession of a controlled substance, violation of bail bond conditions, attempted second degree assault, and attempted third degree assault. Richardson's appeal presents this novel question in Colorado: Is it reversible error for a judge to preside over a case in which his spouse is in the venire and to allow his spouse to remain on the jury?  While we cannot endorse the judge's decision here, even assuming error we affirm because Richardson can show no prejudice resulting from this juror's presence.

## I.     Background

¶ 2     An attempt by three Adams County sheriff's deputies to serve Richardson with an arrest warrant led to a police standoff.  The standoff ended when officers deployed tear gas into the basement crawl space where Richardson was hiding and Richardson fired a gun at the police.

¶ 3     After Richardson was extracted from the crawl space, he was arrested and taken to jail.  While he was changing into jail clothing, a vial containing a white, crystalline substance — later confirmed to be methamphetamine — fell to the floor at Richardson's feet.

1

¶ 4 Richardson was ultimately charged, as a habitual criminal, with possession of a controlled substance, violation of bail bond conditions, five counts of attempted second degree assault or attempted third degree assault, and possession of a weapon by a previous offender. The jury found him guilty of most of the charges (including two counts of attempted second degree assault and three counts of attempted third degree assault), but acquitted him of possession of a weapon by a previous offender. Richardson was then sentenced to an effective term of sixteen years in the Department of Corrections' custody.

¶ 5 Richardson raises five arguments on appeal: (1) there was insufficient evidence to convict him of attempted second degree assault or attempted third degree assault; (2) the presiding judge erred by allowing his spouse to sit on the jury; (3) the court violated his equal protection rights in denying a *Batson v. Kentucky*, 476 U.S. 79 (1986), challenge (to different prospective jurors) as untimely; (4) the court erred by admitting hand-drawn diagrams of the alleged crime scene; and (5) the court erred by allowing a witness to testify as an expert without being qualified as such,

2

despite the court's earlier ruling that the witness must be qualified as an expert to testify. We address these arguments in turn.

## II. Sufficiency of the Evidence

¶ 6      Richardson argues that there was insufficient evidence to support his convictions for attempted second degree assault and attempted third degree assault. We disagree.

### A. Additional Background

¶ 7      Adams County sheriff's deputies and a K-9 dog arrived at Richardson and his daughter's residence. With the daughter's permission, three officers entered the house and — following three announcements of their presence by one officer — sent the K-9 to search the basement. The K-9 did not indicate that there was a person at the bottom of the stairs, so the officers descended into the east side of the basement.

¶ 8      From the bottom of the stairs, the officers observed a water heater and furnace to their left. A sheet hung behind the furnace. Through an opening in the sheet, they saw a bed in the northwest corner of the basement (to their right). The K-9 was directed to search again. As the K-9 approached the opening in the sheet, the officers heard a sound they identified as a loud gunshot. The officer

3

handling the K-9 noted that the K-9 responded to the sound the same way he did to gunshots at the gun range — he hunkered down with his ears down. A male voice from behind the sheet then said, "Fuck you. Send that dog in here and I'll kill it and you're going to kill me."

¶ 9 The officers called for backup, and members of the Commerce City Special Weapons and Tactical (SWAT) team arrived to extract Richardson from the basement. Richardson proceeded to engage five members of the SWAT team in a five-to-six-hour standoff.

¶ 10 Over the course of the standoff, the SWAT team fired multiple rounds of tear gas into the crawl space (at the southwest corner of the basement) where Richardson had barricaded himself. After firing the initial rounds of tear gas, the SWAT team members heard a sound they believed to be a muffled gunshot. Richardson still refused to leave the crawl space — allegedly making comments such as "[w]hy don't you mother fuckers come in and get me," "I'm coming out," "[g]ive me some cigarettes," and "I want my phone." Several more rounds of tear gas were deployed into the crawl space before Richardson surrendered.

## B. Preservation and Standard of Review

¶ 11  Defense counsel moved for a judgment of acquittal on the attempted assault charges. The court granted the motion on the charges concerning the first three alleged victims — the Adams County sheriff's deputies — but denied the motion for the remaining five alleged victims — the SWAT team members.

¶ 12  Although the People suggest that the trial court erred when it granted the motion of acquittal as to the first three officers, they have not cross-appealed and that ruling is not before us. However, Richardson contends that given the acquittal on those charges, he should have been acquitted on the remaining charges. We are not convinced.

¶ 13  "We review de novo whether the evidence is sufficient to support a conviction." *People v. Randell,* 2012 COA 108, ¶ 29. In evaluating the sufficiency of the evidence, we must determine whether a rational fact finder might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the defendant's guilt beyond a reasonable doubt. *People v. Sprouse,* 983 P.2d 771, 777 (Colo. 1999); *Randell,* ¶ 31. Our inquiry is guided by five well-established

5

principles: (1) we give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence; (2) the credibility of witnesses is solely within the jury's province; (3) we may not serve as a thirteenth juror to determine the weight of the evidence; (4) a modicum of relevant evidence will not rationally support a conviction beyond a reasonable doubt; and (5) verdicts in criminal cases may not be based on guessing, speculation, or conjecture. *Sprouse*, 983 P.2d at 778; *Randell*, ¶ 31.

### C.    Analysis

¶ 14     The record evidence was sufficient for the jury to conclude that Richardson attempted second and third degree assault against the SWAT team members.

¶ 15     A person commits attempted second degree assault if, with intent to cause bodily injury to another person, he attempts to cause such injury to any person by means of a deadly weapon. § 18-2-101(1), C.R.S. 2017; § 18-3-203(1)(b), C.R.S. 2017.

¶ 16     A person commits attempted third degree assault if, with criminal negligence, he attempts to cause bodily injury to another person by means of a deadly weapon. § 18-2-101(1); § 18-3-204(1)(a), C.R.S. 2017.

¶ 17    The following evidence was presented to the jury:

- The SWAT team members were familiar with the sound of gunshots — several had experience as firearms instructors or snipers, and they spent significant time training at gun ranges.

- The SWAT team members testified that the tear gas launcher discharging does not sound like a handgun discharging.

- After the initial rounds of tear gas were deployed into the crawl space, several of the officers heard a sound that they identified as "a gunshot from the crawl space," "a muffled gunshot," "a muffled pop which I believed to be a partial gunshot," "what I believe was a gunshot," and "what I thought was a muffled gunshot. It's a very distinct sound[.]"

- One officer saw the insulation around the crawl space move just after he heard the alleged gunshot.

- One officer testified he heard a team member yell, "That was a shot."

7

- The officers initially wondered if Richardson had self-inflicted a gunshot wound until they heard him coughing.

- An officer — located across from the crawl space behind the bed in the basement — heard what he identified as a bullet impact the wall to the left of him after he heard the alleged gunshot.

- The same officer heard Richardson yell something to the effect of "I shot at you" or "The shot came out towards you."

- The SWAT team members checked with each other to confirm a bullet had not ricocheted or hit someone.

- After Richardson was arrested, one of the officers searched the crawl space and found a small semiautomatic handgun — later identified as a .380 — and a single shell casing.

- The recovered gun, which had a capacity of five rounds in the magazine plus one round chambered, had three rounds in the magazine and one round chambered.

8

- The gun was capable of firing, and the recovered shell had been fired from the recovered gun.

¶ 18    This evidence was sufficient for the jury to conclude that (1) a second shot was fired when five members of the SWAT team were in the basement and (2) the shot was directed at them.

¶ 19    Richardson stresses that recovering only one shell casing means the evidence was insufficient to support a finding that two shots were fired in the basement. But, on review we do not sit as a thirteenth juror, *Sprouse*, 983 P.2d at 778, and it is the function of the fact finder alone "to consider and determine the weight to be given to the evidence and to resolve conflicts, inconsistencies, and disputes in the evidence," *People v. Liggett*, 114 P.3d 85, 89 (Colo. App. 2005), *aff'd*, 135 P.3d 725 (Colo. 2006). The photographs of the basement presented to the jury show that the basement was cluttered; the jury could reasonably have concluded that a second shell casing was lost among the disorder, and thus resolve this asserted discrepancy in the evidence.

¶ 20    The jury could reasonably have concluded that Richardson attempted second degree assault or attempted third degree assault because firing at the officers would constitute a substantial step

toward the commission of either offense. § 18–2–101(1) (Criminal attempt is defined as "engag[ing] in conduct constituting a substantial step toward the commission of [an] offense. A substantial step is any conduct . . . which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense.").

¶ 21    The recovered gun in the crawl space allowed the jury to reasonably conclude that Richardson was armed with a deadly weapon.

¶ 22    There was also sufficient evidence — the comment "I shot at you," and the timing of the shot after tear gas was deployed — to conclude that Richardson fired at the officers, evidencing an intent to cause bodily injury. *See* § 18-2-101(1); § 18-3-203(1)(b); *see also People v. Phillips*, 219 P.3d 798, 800 (Colo. App. 2009) ("If there is evidence upon which the jury may reasonably infer an element of the crime, the evidence is sufficient to sustain that element.").

¶ 23    The evidence was also sufficient to conclude that Richardson acted with criminal negligence because he fired a gun in a small space where a bullet would likely cause injury. *See* § 18-2-101(1); § 18-3-204(1)(a).

10

¶ 24 Thus, we reject Richardson's argument that the evidence was insufficient to support his convictions for attempted second degree assault and attempted third degree assault.

### III. Judge's Spouse Serving on the Jury

¶ 25 We now turn to the novel question in Richardson's appeal: Is it reversible error for a judge to preside over a case in which his spouse was in the venire and to allow his spouse to remain on the jury? Richardson argues that the judge had a responsibility to dismiss his spouse — or recuse himself from the case — sua sponte given his counsel's failure to object. Even assuming there was error, and recognizing that the trial judge had other options available in this situation, we affirm.

### A. Preservation

¶ 26 The People argue that Richardson abandoned this argument because no objection was raised during trial and Richardson did not use any challenges on the judge's spouse. The partial dissent suggests that the judge preserved the issue for review by bringing the issue of his wife being in the venire to the attention of the parties. But, it is the responsibility of the litigants — not the judge — to preserve issues for review. *See People v. Cordova,* 293 P.3d

11

114, 120 (Colo. App. 2011) ("To preserve an issue for appeal, a defendant must alert the trial court to the particular issue. This is so because 'the judge must largely rely upon the parties to research and raise issues, and giving the judge the wrong reason for a request is usually equivalent to giving the judge no reason at all.'") (citations omitted).

¶ 27    Whether a defendant waived or forfeited a right is a question of law we review de novo. *See Stackhouse v. People*, 2015 CO 48, ¶ 4. Allowing a defendant to stand silent and then protest an adverse verdict on that basis can "encourage gamesmanship" or allow a windfall for the defendant. *Id.* at ¶ 16.

¶ 28    There is a difference between waiver and forfeiture. *United States v. Olano*, 507 U.S. 725, 733 (1993); *see People v. Lopez*, 129 P.3d 1061, 1065 (Colo. App. 2005). Waiver is the "intentional relinquishment or abandonment of a known right," while "forfeiture is the failure to make the timely assertion of a right." *Olano*, 507 U.S. at 733 (citation omitted); *see also People v. Rediger*, 2018 CO 32, ¶¶ 39-40.

¶ 29    Although the judge and counsel were clearly aware the judge's spouse was in the venire and a member of the selected jury panel,

12

we conclude that Richardson did not timely and properly alert the trial court that he objected to the judge's spouse serving on the jury. Before voir dire, the judge said, "Be nice to Juror 25. My dinner is on the line." During voir dire, the prosecutor spoke to the judge's spouse, Juror 25, but neither party voiced a problem with her serving or otherwise challenged her. When the parties were exercising their peremptory challenges, the judge said, "[Juror 25]? We have the defendant's fifth peremptory challenge to the panel. I need you to make a call." In response, the defense excused a different juror, thus forgoing his opportunity to remove Juror 25.

¶ 30    After the jury was sworn and dismissed for a break, the following dialogue occurred:

> [Judge]: Quite frankly, I don't know that I've ever heard of a sitting judge having a spouse or family member on the jury. There's nothing wrong with it. I think she'll be a fine juror. I have not spoken to her about this case.
>
> [Defense Counsel]: I think we're both afraid to challenge her.
>
> [Judge]: That wasn't a stupid idea. Thank you. I appreciate it.
>
> [Defense Counsel]: Thank you.

13

While defense counsel indicated — after the jury was sworn — that he was afraid to directly challenge the judge's wife, counsel did not sufficiently raise a timely objection.

¶ 31     Whether a defendant is entitled to a jury free of the presiding judge's spouse is a novel question in Colorado. And, it is unclear if that is a right that a defendant or his counsel can affirmatively waive. Crim. P. 24(b)(2) (providing that, generally, the parties waive all matters relating to the qualification and competency of prospective jurors by not raising the issues prior to the jury being sworn in, but exceptions may apply); *see Olano*, 507 U.S. at 733; *Stackhouse*, ¶ 15 ("[O]nly a select few rights are so important as to require knowing, voluntary, and intelligent waiver to be personally executed by the defendant."); *cf. People v. Bowens*, 943 N.E.2d 1249, 1258 (Ill. App. Ct. 2011) ("These circumstances compel the conclusion that defendant's decision not to peremptorily remove [the judge's spouse] was an affirmative acquiescence to [the spouse's] jury service, which thereby constitutes a waiver of this issue on appeal."). Even assuming error, because Richardson failed to make a timely objection, we conclude he at least forfeited the right. *See Olano*, 507 U.S. at 733; *see also Weaver v.*

14

*Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1912-13 (2017) (deciding that constitutional error, even a structural error, can be forfeited and waived).

¶ 32 Forfeited errors can be reviewed on appeal for plain error. *See Rediger*, ¶ 40; *see also Stackhouse*, ¶ 27 (Márquez, J., dissenting) ("Yet, if a legal rule is violated during trial, 'and if the defendant did not waive the rule, then there has been an "error" . . . despite the absence of a timely objection.'" (quoting *Olano*, 507 U.S. at 733-34)).

### B. Standard of Review

¶ 33 Before addressing the merits of Richardson's argument, the first question is whether this was structural error requiring automatic reversal or plain error. While it may have been preferable for the trial judge to excuse his spouse from jury service or to recuse himself, because counsel chose not to challenge her or otherwise seek relief, we cannot say — based on this record — that either decision constitutes structural error. Given Richardson's failure to point to prejudice resulting from the spouse's jury service, we conclude that the judge's conduct here did not amount to plain error.

## 1. Structural Error

¶ 34    Structural errors require reversal, regardless of whether the error affected the judgment of conviction. *Hagos v. People*, 2012 CO 63, ¶ 10. Examples of these errors in Colorado include "complete deprivation of counsel, trial before a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation, and denial of the right to a public trial." *Id.* None of these errors are at issue here.

¶ 35    An error is structural when it affects the framework of the trial rather than being an error in the trial process. *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1907 (concluding that prejudice is not presumed where a defendant first claims a violation of his right to a public trial in an ineffective assistance of counsel claim). The Supreme Court has identified three broad rationales for what constitutes a structural error: (1) the right "is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) the error's effects are too hard to measure; and (3) "the error always results in fundamental unfairness." *Id.* at ___, 137 S. Ct. at 1908.

16

## a. Right Protects Some Other Interest

¶ 36    The first rationale does not appear to apply here because, contrary to the partial dissent's assertion, there is apparently no widely recognized interest in having a jury free of a presiding judge's spouse. *Compare People v. Hartson*, 553 N.Y.S.2d 537, 538-39 (N.Y. App. Div. 1990) (holding that the trial judge's wife serving as a juror required automatic reversal, even though the defendant did not raise a timely objection and there was no evidence of actual prejudice), *with State v. Sellhausen*, 809 N.W.2d 14, 28 (Wis. 2012) (Ziegler, J., concurring) (asserting that a presiding judge's immediate family member serving as a juror is not "*per se* objectively biased"). Having a presiding judge's spouse on the jury does not in and of itself create partiality. *See Hartson*, 553 N.Y.S.2d at 538-39; *Sellhausen*, 809 N.W. 2d at 28; *see also United States v. Tejeda*, 481 F.3d 44, 50-52 (1st Cir. 2007) (recognizing that neither juror bias nor juror misconduct is structural error, but attorney or judicial bias is); *Carratelli v. State*, 961 So. 2d 312, 325-26 (Fla. 2007) (inquiring into whether an actually biased juror served on the jury); *People v. Miller*, 759 N.W.2d 850, 855-56 (Mich. 2008) (concluding it was not structural error for a convicted felon to serve

17

as a juror and was harmless error absent a showing that the juror was not impartial).  *But see Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006) (where counsel's ineffectiveness resulted in seating a biased juror, prejudice was presumed).

### b.    Effects Too Hard to Measure

¶ 37    The second rationale has been applied in very limited circumstances, notably, when the defendant is denied the right to select his own counsel.  *See Weaver*, 582 U.S. at ___, 137 S. Ct. at 1908.  This sort of error must pervade the entirety of the proceedings.  *State v. Travis*, 813 N.W.2d 702, 706-08 (Wis. Ct. App. 2012) (holding structural error existed where the prosecution mistakenly told the court that there was a five-year mandatory minimum prison sentence for the applicable charges).  Here, Richardson does not assert that the trial was conducted in a different manner than it otherwise would have been had the judge's spouse not been on the jury.  *Cf. id.* at 708 (considering situation where the error — misstating the law — affected the charging, plea negotiations, discussions with counsel, plea hearing, and sentencing).  Counsel did not challenge the judge's spouse during voir dire, so the trial was not colored by circumstances suggesting

18

Richardson was unable to select the jury he wanted. *See Weaver*, 582 U.S. at ___, 137 S. Ct. at 1913 (noting that the defendant's trial was not fundamentally unfair where his mother and her minister were excluded from the courtroom during part of jury selection because the trial was not conducted in a secret or remote place). Defense counsel advocated zealously throughout trial on Richardson's behalf, undermining any argument that counsel was afraid of the judge or uncomfortable conducting a trial in the presence of the judge's spouse. *Contra Davis v. Ayala*, 576 U.S. ___, ___, 135 S. Ct. 2187, 2213 (2015) (Sotomayor, J., dissenting) (asserting that because the record lacked material facts as to what defense counsel would have asserted had he been present at an ex parte *Batson* hearing, the Court was left to speculate on what the trial court considered and thus counsel's absence constituted reversible error). Contrary to the partial dissent's assertion, the question is not whether the jurors were influenced by the judge's wife. The inquiry is, if they deferred to her, did that deference lead to an actual bias against Richardson, and the record does not reveal one. Indeed, the jury returned a mixed verdict, part of which favored Richardson. Thus, we are not convinced that the claimed

error here so pervaded the trial that its effects became impossible to measure.

### c. Error Resulting in Fundamental Unfairness

¶ 38 The third rationale has been applied where an indigent defendant was denied an attorney or the trial judge failed to give a reasonable doubt instruction. *See Weaver*, 582 U.S. at ___, 137 S. Ct. at 1908. The United States Supreme Court explained that an error could be structural "even if the error does not lead to fundamental unfairness in every case." *Id.* But, the error must still be one that "infect[s] the entire trial process and necessarily render[s] a trial fundamentally unfair." *People v. Novotny*, 2014 CO 18, ¶ 21.

¶ 39 Here, we are not convinced that the judge's spouse being on the jury — where the defense failed to contemporaneously object to her presence and points to no objective record evidence of prejudice — rendered the trial fundamentally unfair. Richardson's ability to shape the jury was not impeded and none of the statutory rules dictating qualifications for jury service were broken. *See* § 13-71-105, C.R.S. 2017; *Novotny*, ¶ 7. *But see* C.J.C. 1.2 ("A judge shall act at all times in a manner that promotes public

confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the *appearance of impropriety.*") (emphasis added). Significantly, there were no indications of bias by Juror 25 for or against Richardson. *See, e.g., People v. Maestas,* 2014 COA 139M, ¶ 14 (holding that jurors who said they could not afford the defendant a presumption of innocence should have been removed for cause). While Juror 25's questionnaire indicated that she might be distracted because the judge was her husband, she stated that there was no reason she could not be fair if she was selected for the jury. In fact, she had previously served on a jury. Thus, contrary to the partial dissent's position, Juror 25 indicated she was willing to render a fair and impartial verdict. And none of the attorneys challenged the trial judge's statement that he had not discussed the case with her, and would not do so. But, in allowing his spouse to remain on the jury, the presiding judge created a situation where he later might have been called to assess her fairness, *if* either party had challenged her. *See, e.g., City of New York v. Exxon Corp.,* 683 F. Supp. 70, 72 (S.D.N.Y. 1988) ("Under certain circumstances, a judge's relationship with a prospective witness is a proper basis for recusal.

21

For example, in *United States v. Ferguson*, 550 F. Supp. 1256 (S.D.N.Y. 1982), . . . where the credibility of a former law clerk was 'a vital issue' in the case[,] . . . the judge's impartiality might reasonably have been questioned had he presided over the trial.").

¶ 40    We recognize that the "class of error to which bright-line rules of reversal" apply has greatly narrowed. *Novotny*, ¶ 21; *see Weaver*, 582 U.S. at ___, 137 S. Ct. at 1909. Further, as a court of error correction, it is not our prerogative to declare new classes of structural errors as the partial dissent attempts to do. Because Richardson cannot point to any prejudice resulting from the judge's spouse serving on the jury, we are unable to conclude, based on this record, that this presiding judge's spouse's presence on the jury rose to the level of structural error. *See Weaver*, 582 U.S. at ___, 137 S. Ct. at 1910 (refusing to review error implicating the right to a public trial for structural error where the defendant failed to preserve the issue on direct review); *see also Bowens*, 943 N.E.2d at 1259 (holding that because the defendant failed to assert actual bias, there was no error in the judge's spouse sitting on the jury based merely on the appearance of bias).

¶ 41 The partial dissent appears to conclude that the judge should have, sua sponte, recused himself or dismissed his spouse when he realized she was in the venire. He did not act sua sponte, and counsel did not object. Thus, our proper inquiry here, indeed our only inquiry, is whether the spouse's presence on the jury so undermined the fundamental fairness of the trial that it cast doubt on the reliability of the judgment of conviction. *See Bowens*, 943 N.E.2d at 1259 ("On this record, we decline to address whether jury service by a trial judge's spouse in a case in which (1) that judge presides and (2) defendant has not acquiesced in that service, might constitute *per se* reversible trial error."). A doubt on the reliability of the judgment of conviction would have to stem from actual bias by the judge directed toward *the parties* and not toward a juror, which is the partial dissent's main focus. The partial dissent is prematurely anticipating the next case, when an objection is lodged and the judge is called upon to decide his spouse's impartiality. That is not what happened here, and, as discussed below, Richardson fails to allege any actual prejudice.

¶ 42 Therefore, we review for plain error.

## 2. Plain Error

¶ 43 "Plain error is obvious and substantial." *Hagos*, ¶ 14. We reverse under the plain error standard to correct "particularly egregious errors," *id.* (citation omitted), that "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction," *id.* (citation omitted). Richardson has not cited — and we have not found — a Colorado statute or case that makes it clear, let alone obvious, that it is error for a judge's spouse to serve on a jury in which the judge presides. Nor does the record demonstrate that the jury service of the judge's wife resulted in a fundamentally unfair trial or caused serious doubt about the reliability of the judgment of conviction.

## C. Law and Analysis

¶ 44 There are specific circumstances under which a court must sustain a challenge to a juror for cause. § 16-10-103, C.R.S. 2017; Crim. P. 24(b)(1). A marital relationship between the judge and a juror is not included in these circumstances. Richardson argues that we should interpret section 16-10-103(1)(b)'s language, "[r]elationship within the third degree, by blood, adoption, or marriage, to a defendant or to any attorney of record or attorney

24

engaged in the trial of the case," to include a circumstance where the judge's spouse is on the jury because the judge is an attorney involved in the case.[1] We are not convinced. Considering the statute as a whole and giving the word "attorney" its plain and ordinary meaning in context, it is apparent that it refers to attorneys who represent or have represented the parties and advocated on their behalf. Moreover, an attorney is defined as "[s]omeone who practices law," Black's Law Dictionary 153 (10th ed. 2014), and a judge is prohibited from engaging in the practice of law, C.J.C. 3.10. Thus, the judge's relationship to his wife does not contravene the plain meaning of the statute. Nonetheless, even assuming the trial court erred, we cannot automatically reverse

---

[1] The legislature or our supreme court, not a division of this court, would be the proper body to amend the statutes or rules dictating juror qualification or the rules requiring judicial recusal. Colo. Const. art. VI, § 21 ("The supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases."); *see, e.g.*, *People v. Miller*, 759 N.W.2d 850, 855-56 (Mich. 2008) ("[T]he right to a jury free of convicted felons is granted by statute."); *see also* Raymond J. McKoski, *Judicial Discipline and the Appearance of Impropriety: What the Public Sees is What the Judge Gets*, 94 Minn. L. Rev. 1914, 1960 (2010) ("But [the decision that a judge's spouse should not serve as a juror in a case presided over by the judge] is a policy question properly left to those charged with writing a judicial code.").

without a showing that a jury was biased with regard to the parties. *Weaver*, 582 U.S. at \_\_\_, 137 S. Ct. at 1912-13; *Olano*, 507 U.S. at 733.

¶ 45 Richardson also argues that the judge should have sua sponte removed his spouse from the jury — or recused himself from the case — because judges must "act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." C.J.C. 1.2. True, the judicial code creates high standards and high expectations for judges. However, Richardson's contention is that having the judge's wife on the jury affected the fairness of the jury, not the independence, integrity, or impartiality of the judge. Nonetheless, we understand Richardson's position. Making remarks during trial that highlighted his relationship to this juror — such as "I said no to my wife" in response to a question from Juror 25 about witness testimony; "[w]hat are we having for dinner"; "[w]hat am I getting tonight? . . . I'm getting chicken again"; and "[y]ou forced [my wife] to spend more time with me[,] which is worse" — affected the solemnity of the proceedings and were ill-advised.

26

¶ 46 Counsel's comment that the attorneys were afraid to challenge the judge's spouse and the judge's response, "That wasn't a stupid idea," were made when the jury was not present, so speculation that the jury might have given greater consideration to her opinions are just that — speculation. *See United States v. Poindexter*, 942 F.2d 354, 360 (6th Cir. 1991) (noting the significance of the jury's presence in determining whether a judge's comment unfairly prejudiced the defendant); *see also Ayala*, 576 U.S. at ___, 135 S. Ct. at 2208 (holding that exclusion of the defendant's attorney from an ex parte *Batson* hearing constituted harmless error where the record provided nothing more than speculation about what defense counsel might have said had he been present at the *Batson* hearing).

¶ 47 Although it would have been prudent for the judge to excuse his wife — or to recuse himself as presiding judge — we cannot say that his misjudgment was so egregious that it requires reversal under the plain error standard. As we already concluded, the evidence was sufficient to support Richardson's conviction; and Richardson failed to show how this juror's service calls the reliability of the judgment of conviction into question. *Hagos*, ¶ 14;

*Sprouse*, 983 P.2d at 777 (Evidence is sufficient where it "support[s] a finding of the accused's guilt beyond a reasonable doubt."). The judge stated he had not discussed the case with his wife and he would instruct their son not to discuss the case at home. The record reflects no challenge to these statements, no suggestion of juror bias, and no evidence of prejudice to Richardson. Based on this record, we must conclude that the judge's spouse's service did not "so undermine the fundamental fairness" of Richardson's trial that reversal is warranted. *See Hagos*, ¶ 14.

### IV.    *Batson* Challenge

¶ 48    Richardson argues that the trial judge incorrectly denied his *Batson* challenge as untimely. We disagree.

¶ 49    We agree with the People that Richardson failed to preserve his *Batson* challenge.

¶ 50    During voir dire, the prosecution used its fifth and sixth peremptory challenges on the two remaining African Americans in the venire. The jury was immediately sworn in and excused for a break. Defense counsel then stated that he might make a motion but first wanted to talk to the prosecutor about the final two peremptory challenges. The court responded, "If this is a *Batson*

28

challenge, it's far too late to do that. . . . That's a challenge that has to be made while we have those people here."

¶ 51    Later, defense counsel attempted to renew the *Batson* challenge. The court again responded that the challenge was not proper because (1) it had not been made contemporaneously and (2) the appropriate remedy of disallowing the challenged peremptory strike was no longer available as the venire had been dismissed.

¶ 52    "[A] *Batson* objection must be made before the venire is dismissed and the trial begins." *People v. Mendoza*, 876 P.2d 98, 102 (Colo. App. 1994). Here, defense counsel waited until after the venire was dismissed to make the *Batson* objection. The trial court was thus correct in holding that Richardson's *Batson* objection was untimely. *See id.*

## V.    Diagrams

¶ 53    Richardson next argues that three hand-drawn diagrams, entered as Exhibits 45, 46, and 47, were not fair and accurate representations of the alleged crime scene and thus were not admissible as demonstrative evidence. He also argues that the court violated his constitutional right to confrontation when it

29

limited questioning regarding the alleged inaccuracies of the exhibits. We disagree.

### A. Additional Background and Preservation

¶ 54    The prosecution introduced the three diagrams during the testimony of various police officers and investigators to help the jury understand the basement's layout.



Exhibit 45



Exhibit 46



Exhibit 47

¶ 55    Exhibit 45 was first introduced through an investigator's

testimony.  Defense counsel objected on the basis that the diagram

31

was not drawn to scale. The court overruled the objection, stating, "I'm going to allow it with the understanding that it's not drawn to scale. I think the jury has the right to get an idea of what the basement looked like even if it isn't a drawing that's to scale."

¶ 56 Defense counsel objected on similar grounds to the admission of Exhibits 46 and 47. The court disagreed, noting that even if the three diagrams contained inconsistencies, "It's not unusual to have conflicting evidence. The [p]eople who resolve those conflicts [are] the jury."

### B. Standard of Review and Law

¶ 57 The admission of demonstrative evidence is within the trial court's discretion. *People v. Richardson*, 58 P.3d 1039, 1045 (Colo. App. 2002). An abuse of that discretion occurs only when the trial court's ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Rath*, 44 P.3d 1033, 1043 (Colo. 2002).

¶ 58 Demonstrative evidence must constitute a "fair and accurate representation." *People v. Brown*, 313 P.3d 608, 614 n.3 (Colo. App. 2011); *see Richardson*, 58 P.3d at 1045 ("[D]emonstrative or illustrative evidence must be shown to be reasonably accurate and correct[.]"). Every detail of the evidence does not have to be exact,

"but the important elements must be identical or very similar" to the represented scene. *People v. Douglas*, 2016 COA 59, ¶ 45 (citation omitted). "It is not necessary that the witness whose testimony is illustrated [by the demonstrative exhibit] has personally prepared the evidence." *Richardson*, 58 P.3d at 1045-46. As long as the evidence fairly and accurately portrays the proponent's version of events, the court is not required to exclude the evidence if it is inconsistent with evidence or testimony the opposing party presents. *Douglas*, ¶ 45.

### C. Analysis

¶ 59 Here, the challenged exhibits are a fair and accurate representation of the alleged crime scene. None of the witnesses testified that the diagrams were exact replicas of the basement; rather, they testified that they were rough drawings created from memory introduced to help the jury understand the basement's layout. The jury could reasonably understand that slight variations among the diagrams — specifically the exact location of the water heater and furnace — might vary in drawings not drawn to scale and created from memory. *See People v. Wilson*, 2014 COA 114, ¶ 67 ("It is not expected that jurors should leave their common

33

sense and cognitive functions at the door . . . . Nor is it expected that jurors should not apply their own knowledge, experience, and perceptions acquired in the everyday affairs of life to reach a verdict.") (citation omitted). And, the jury could find the exhibits useful in understanding what happened in the basement.

¶ 60 That witnesses whose testimony was illustrated by the diagrams did not prepare the exhibits is also immaterial. *See Richardson*, 58 P.3d at 1045-46. None of the discrepancies in the diagrams Richardson highlights is so grave that they could have seriously misled the jury because the witnesses' testimony on the basement's layout was consistent, and the testimony and three diagrams were consistent with corresponding photographic evidence of the basement. *See People v. Cardenas*, 42 Colo. App. 61, 65, 592 P.2d 1348, 1352 (1979) ("The question of what constitutes a permissible variation depends upon whether it tends to confuse or mislead the jury."); *see also People v. Stewart*, 2017 COA 99, ¶ 67 (stating that discrepancies between experimental evidence created for trial and actual conditions at the time of the crime went to the evidence's weight, not its admissibility).

¶ 61　　Finally, the trial court did not violate Richardson's confrontation right. The judge did not unreasonably limit defense counsel's questions on the accuracy of the diagrams where counsel had ample opportunity to highlight these purported inaccuracies during voir dire and on cross-examination. *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008) ("[T]he scope and duration of cross-examination [are] controlled by the trial court, and judges have wide latitude under the Confrontation Clause to impose reasonable limits on cross-examination because of concerns about harassment, prejudice, repetition, or marginal relevance."). Thus, the judge was within his discretion to limit repetitive questioning on the fact that the diagrams were not to scale.

## VI.　Expert Testimony

¶ 62　　The prosecutor called a crime scene investigator (CSI) to testify — based on her training and experience — on the trajectory of bullets, the use and placement of trajectory rods, whether certain holes and marks discovered at the alleged crime scene were made by bullets, and where and how bullets and shell casings land.

¶ 63    Richardson argues that the trial court reversibly erred in allowing the CSI to testify as an expert without being qualified as such.  We disagree.

### A.    Preservation and Standard of Review

¶ 64    The parties disagree regarding whether Richardson preserved this issue.  "[W]hen an opponent acts contrary to a pretrial order, a party must contemporaneously object to preserve an appellate argument that the court should have prohibited the action."  *People v. Dinapoli*, 2015 COA 9, ¶ 24.  *But see Camp Bird Colo., Inc. v. Bd. of Cty. Comm'rs*, 215 P.3d 1277, 1289-90 (Colo. App. 2009) ("Once the trial court makes definitive rulings either at or before trial, the objecting party need not renew the objection contemporaneously during trial to preserve a claim of error on appeal.").

¶ 65    At a pretrial hearing, the court granted defense counsel's request that the CSI be designated as an expert witness.  The court stated, "Well, the things that she spoke about are clearly things that a normal lay person would not know so they cannot be discussed by a lay witness."  When the prosecution submitted its endorsed witnesses, it did not designate the CSI as an expert.  At trial, the prosecution did not qualify the CSI as an expert.  But, defense

36

counsel did not contemporaneously object to her trial testimony or otherwise alert the court to its pretrial ruling. *See Dinapoli*, ¶ 22.

¶ 66 We review unpreserved claims for plain error, and we will reverse only if an error was obvious and substantial. *Hagos*, ¶ 14. "Obvious" means the error was so clear cut that the trial judge should have been able to avoid it even without the benefit of an objection. *People v. Pollard*, 2013 COA 31M, ¶ 39. "Substantial" means the error was so serious that it undermined the fundamental fairness of the trial "so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted).

### B. Analysis

¶ 67 Even if the error was obvious, Richardson fails to show that it was substantial. Thus, we conclude the court did not plainly err in allowing the CSI to testify, absent a contemporaneous objection, as a lay witness.

¶ 68 The CSI's testimony was based primarily on her observations of the alleged crime scene — not on her technical knowledge. Her observations were consistent with other witnesses' testimony, and defense counsel had ample opportunity to challenge her on cross-examination. *See People v. Caldwell*, 43 P.3d 663, 667 (Colo.

App. 2001) (The trial court did not err in admitting a lay witness' testimony on ballistics based on the witness' observations because "[s]uch observations could just as easily have been made by the jury from the photographs. No special expertise is required to look at the hole made by the bullet and realize that it followed a straight-line path.").

¶ 69    The essence of the CSI's testimony was that, based on the appearance of a hole in the insulation, it seemed to have been punctured by a projectile coming out of the crawl space. She also testified that she did not test the hole for gunshot residue and admitted on cross-examination that she could not say with certainty that a mark on the basement's west wall was made by a bullet. *See Davis v. People*, 2013 CO 57, ¶ 18 (affirming that a detective's testimony on interviewee credibility was admissible where all three interviewees were subject to cross-examination, thus providing the jury an opportunity to judge the witnesses' credibility). While the CSI was the only witness who testified on the possible trajectory of the bullet, other witnesses testified on the bullet being fired, and another expert testified that the gun recovered from the crawl space was functional. Thus, we cannot

say the CSI's testimony, without her being qualified as an expert, created an error that was so substantial that it undermined the fundamental fairness of the trial. *See Hagos*, ¶ 14.

## VII. Conclusion

¶ 70 While it would have been preferable for the judge to excuse his spouse or to recuse himself from the case, reversal here is not warranted. Because Richardson's other arguments fail, we affirm.

JUDGE CARPARELLI specially concurs.

JUDGE FURMAN concurs in part and dissents in part.

JUDGE CARPARELLI, specially concurring.

¶ 71    I concur in the majority opinion but write separately to further discuss the issues addressed in the partially dissenting opinion.

## I.    Structural Error

¶ 72    The partial dissent refers to the three rationales for structural error that the United States Supreme Court identified in *Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1903 (2017), but its analysis applies the second and third rationales beyond the Court's explanation of those rationales.  In *Weaver*, the Supreme Court stated that structural error "affect[s] the framework within which the trial proceeds" and "def[ies] analysis by harmless error standards."  *Id.* at ___, 137 S. Ct. at 1907-08 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309, 310 (1991)).

¶ 73    With regard to the second *Weaver* rationale — errors too hard to measure — the Court cited the denial of a defendant's right to select his or her own attorney as an example of circumstances in which "the precise 'effect of the violation cannot be ascertained,'" *id.* at ___, 137 S. Ct. at 1908 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)), it would be "almost impossible to show that the error was 'harmless beyond a reasonable doubt,'

40

[and] the efficiency costs of letting the government try to make the showing are unjustified," *id.* (citation omitted). When a defendant is denied this right to select counsel, he is denied the benefit of his preferred counsel's knowledge, skills, experience, and tactics. Because the harm is in the manner in which the entire defense case was tried, the harm cannot be measured by evaluating the evidence and the outcome of the trial and determining "with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial." *People v. Stewart*, 55 P.3d 107, 124 (Colo. 2002) (quoting *People v. Gaffney*, 769 P.2d 1081, 1088 (Colo. 1989)).

¶ 74    With regard to the third *Weaver* rationale — errors that always result in fundamental unfairness — the Court gave two examples: denying counsel to an indigent defendant and failing to give a reasonable doubt instruction. As to these, the Court again noted that it "would be futile for the government to try to show harmlessness." *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1908. With regard to the denial of counsel, the defendant is also denied the benefit of an attorney's knowledge, skills, experience, and tactics, and the harm cannot be measured by reviewing the evidence and

the outcome. Proof beyond a reasonable doubt is fundamental to the determination of whether a defendant is guilty or not guilty. Failure to give a reasonable doubt instruction renders the jury's verdict and the outcome of the trial invalid. Harm cannot be determined by appellate review of the evidence.

¶ 75    Here, the effect of the judge's wife's service on the jury can be ascertained based on a review of the evidence and is susceptible of constitutional harmless error and plain error review. Therefore, I conclude that these two rationales do not support application of structural error.

## II. Preservation

¶ 76    If, as the partial dissent argues, the asserted error was preserved, we would not treat it as structural error, but, instead, review it for harmless error or, perhaps, constitutional harmless error. Here, however, the asserted error was not preserved.

¶ 77    Preservation requires more than a court's awareness of an issue and an opportunity to rule on it sua sponte. The dissent cites a criminal case, *People v. Abu-Nantambu-El*, 2017 COA 154, that relies on a civil case, *Berra v. Springer & Steinberg, P.C.*, 251 P.3d 567, 570 (Colo. App. 2010), for the premise that a court's

42

awareness and opportunity to rule are sufficient to preserve an issue. In *Abu-Nantambu-El*, the juror was statutorily disqualified to serve. Defense counsel challenged the juror for cause and stated a statutory basis for the juror's disqualification, but did not refer the court to the statute itself. The division rejected the People's argument that defendant's failure to cite the statute constituted a waiver. In this context, the division said the court had enough information to understand the challenge. Those are not the facts here.

¶ 78    Here, the record demonstrates that defendant was aware of the issue and decided to accept the juror. In such circumstances, courts should not permit a defendant to "intentionally withhold an objection to a constitutional deficiency, on appeal argue that the error was not harmless beyond a reasonable doubt, and thus, unfairly manipulate the judicial process." *People v. Petschow*, 119 P.3d 495, 499 (Colo. App. 2004); *see United States v. Stewart*, 256 F.3d 231, 239 (4th Cir. 2001).

## III.    Whether Defense Counsel Was "Chilled"

¶ 79    As quoted in the partial dissent, there was a colloquy in which defense counsel said, "I think we're both afraid to challenge [the

43

judge's wife]." This statement is not sufficient to support any conclusions about defense counsel's thinking and preferences about whether having the judge's spouse on the jury would be good or bad for his client. Moreover, from the cold record, it is impossible to determine whether defense counsel was engaging in playful banter or wanted the court to know that he and the prosecutor were both too timid to exercise a peremptory challenge. As to the former, the judge's reply that it was not a stupid idea suggests playful banter. As to the latter, I cannot conclude that the defense counsel was forthrightly telling the judge that he and opposing counsel were afraid that the judge would not be fair to them if they challenged his wife.

## IV.    Plain Error

¶ 80    Thus, the issue here is whether it was obvious and substantial error for the judge to defer to the parties' counsel about whether his wife should sit as a juror, and, if so, whether that error so undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction.

¶ 81    The evidence as recounted in Part II.A of the majority opinion demonstrates that the evidence of guilt regarding the offenses of

44

which defendant was convicted was strong. In addition, the jury, including the judge's wife, found defendant not guilty of one of the charges.

¶ 82    For these reasons and those stated in the majority opinion, I conclude that the presence of the judge's wife on the jury did not undermine the fundamental fairness of the trial and does not cast serious doubt on the reliability of the judgment of conviction.

JUDGE FURMAN, concurring in part and dissenting in part.

¶ 83    The judge permitted his wife to sit on Richardson's jury, over which he presided.  In my view, this was error because it resulted in the judge

- not affording Richardson's counsel the freedom to challenge either the judge's wife or the judge about his wife — as the record reveals;

- being unable to impartially assess all potential jurors for their fitness to serve on Richardson's jury;

- according his wife special treatment during jury selection and throughout trial; and

- making trifling comments to and about his wife in a case involving serious criminal accusations.

¶ 84    Because I presume the judge was biased toward his wife, and this created both an appearance of impropriety and improperly affected the structure of the trial itself, I would reverse Richardson's convictions.  I therefore dissent from Part III of the majority opinion finding no error in the judge's wife serving as a juror.  I agree with the majority that the evidence is legally sufficient based on the existing record and concur in that part of the majority opinion.

Because I would reverse based on the judge's presumed bias, I would not address the other issues.

## I. The Judge and Juror 25

¶ 85 The judge's overt references to his relationship with his wife (Juror 25) began when the proceeding to select the jury started.

¶ 86 At the beginning of voir dire, the judge declared to the courtroom, "Be nice to Juror 25. My dinner is on the line."

¶ 87 On her jury questionnaire, in response to the question whether "there is any reason you believe you could not be a fair juror in a criminal case," Juror 25 wrote, "I don't know." She explained, "[The] Judge . . . is my husband — I might be distracted."

¶ 88 During voir dire, the prosecutor asked Juror 25, "[The] Judge . . . is your husband?" Juror 25 confirmed, in front of the members of the venire, to which the judge said, "Lucky you."

¶ 89 After both parties had finished exercising their peremptory challenges, and the jury was empaneled, the judge and counsel had the following exchange outside of the jury's presence:

> THE COURT: Quite frankly, I don't know that I've ever heard of a sitting judge having a spouse or family member on the jury. There's nothing wrong with it. I think she'll be a fine

47

> juror. I have not spoken to her about this case. . . .
>
> [DEFENSE COUNSEL]: I think we're both afraid to challenge her.
>
> THE COURT: *That wasn't a stupid idea.* Thank you. I appreciate it.

(Emphasis added.)

¶ 90 Throughout the trial and in front of the jury, the judge made comments toward and about his wife. At least twice on the record, the judge asked Juror 25 what they were "having for dinner." The following dialogue took place before dismissing the jury on the third day of trial:

> THE COURT: What am I getting tonight? We'll get the teriyaki.
>
> JUROR [25]: Chicken.
>
> THE COURT: I'm getting chicken again? Oh God.

¶ 91 Before deliberation — in the beginning of the defense's closing argument and in front of the jury — the following exchange took place:

> [DEFENSE COUNSEL]: [This trial has] taken you away from your families and children. It's taken you away from your spouses. Not everyone has been taken away.

48

> JUROR [25]: I've spent more time with him this week than usual.
>
> THE COURT: You forced her to spend more time with me which is worse.
>
> [DEFENSE COUNSEL]: That is unique in jurisprudence in Colorado.

¶ 92    Both the judge and defense counsel pointed out the uniqueness of this situation.  Indeed, neither the United States Supreme Court nor our supreme court has addressed whether it is error for a judge to permit his or her spouse to serve on a jury over which he or she presides.  Few courts have.

## II.    My Disagreement with the Majority

¶ 93    I respectfully disagree with the majority's plain error analysis. I will first discuss why it is error for a judge to permit his or her spouse to serve on the jury over which he or she presides.  I will then discuss my disagreement with the majority over whether this issue was preserved.  After concluding the error was preserved, I will then turn to a discussion about the error's impact on the trial — premised both on the critical role that trial court judges play in ensuring that defendants in criminal cases receive a fair jury trial and on the impact on a fair trial when a judge permits his or her spouse to sit on a jury over which he or she presides.  I will

49

conclude with a discussion of why I believe the consequence of such an error both creates an appearance of impropriety and improperly affects the structure of the trial itself.

## A. The Error

¶ 94 Several courts have concluded that it is error for a trial judge to permit a member of his or her immediate family to serve on a jury.

¶ 95 In *State v. Tody,* 764 N.W.2d 737 (Wis. 2009), *abrogated by State v. Sellhausen,* 809 N.W.2d 14, 28-29 (Wis. 2012) (Ziegler, J., concurring), the circuit court judge denied a causal challenge to the circuit court judge's mother serving on a jury over which the judge presided. Although defense counsel did not exercise a peremptory challenge, the Wisconsin Supreme Court reversed, holding that the circuit court judge's mother was per se objectively biased. *Id.* at 746. The court reasoned, in part, as follows:

> [A] close and familial link between the judge and a juror is not congruent with one of the basic purposes underlying the constitutional guarantee of trial by an impartial jury. The United States Supreme Court has recognized that the federal constitution, as well as the constitutions of the many states, provides for trial by jury in criminal cases in large part to protect against the abuses of judges. The

> presence of a member of the judge's immediate family on the jury seems conspicuously inconsistent with the jury's function as, in part, a check upon the power of the judge.

*Id.* at 745-46 (footnote omitted). In my view, the Wisconsin Supreme Court's reasoning applies equally, if not more so, to the present case because the judge's wife served on this jury.

¶ 96     In *Sellhausen,* defense counsel used a peremptory challenge to remove the judge's daughter-in-law from the jury. 809 N.W.2d at 17. The Wisconsin Supreme Court affirmed, holding that reversal of the conviction is not automatically required when a peremptory strike removes the challenged juror from the jury. *Id.* at 19, 22. The court rejected defense counsel's argument that the use of a peremptory challenge forced counsel to adopt an adversarial stance to the judge, reasoning as follows:

> We understand that attorneys fear antagonizing judges. This fear is part of the legal lore and legal culture. Lawyers fear that judges, like other persons, may harbor ill will to the messenger when they dislike or are bothered by the message. As judges ourselves, we tend to view any such concerns by lawyers as exaggerated, but we appreciate that lawyers' perceptions may be different. Although judges are expected to perform their duties objectively, impartially, and unemotionally, lawyers and non-lawyers alike must concede

51

> that judges are not immune to human emotions.
>
> We are not persuaded, however, that the risk of an adversarial relationship developing between the presiding judge and defense counsel in the circumstances of the present case is great enough to warrant automatic reversal absent evidence that a party's substantial rights were actually impaired.
>
> Nothing in the record suggests that defense counsel changed trial strategy because he feared antagonizing the circuit court judge. Nothing in the record suggests that the circuit court judge harbored any resentment toward defense counsel for using a peremptory strike to remove the daughter-in-law from the jury. The potential chilling effect that concerned the court in *Tody* does not appear to be present in the instant case.

*Id.* at 22.

¶ 97     But the same cannot be said of the circumstances of this case. Defense counsel apparently changed strategy by not making a peremptory strike of the judge's wife, and the record shows that the judge would likely have harbored resentment if counsel had made such a challenge by (1) informing counsel that not challenging her "wasn't a stupid idea" and (2) expressing appreciation for counsel not doing so.

52

¶ 98    In *People v. Hartson*, 553 N.Y.S.2d 537, 539 (N.Y. App. Div. 1990), the Appellate Division of the New York Supreme Court reversed the defendant's convictions of rape in the third degree and incest, even though the defendant did not timely challenge the seating of the trial judge's wife.  The court reasoned that the case necessitated reversal "given the importance of defendant's right to an impartial jury and the concomitant right of the public at large that the jury appear to be impartial."  *Id.*

¶ 99    And, in *Elmore v. State*, 144 S.W.3d 278, 279-80 (Ark. 2004), the Arkansas Supreme Court reversed a defendant's conviction for the rape of his twelve-year-old stepdaughter because the trial judge permitted his spouse to sit on the jury.  Without embarking on a discussion of structural defects, the court reasoned that an appearance of impropriety warranted reversal.  *Id.*

¶ 100   In the present case, I believe the judge had two options: (1) excuse his wife before the proceedings began or (2) recuse himself from the trial after questioning started based on the appearance of impropriety.  *See* C.J.C. 2.11(A) ("A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned . . . .").  I believe the judge erred by not

53

choosing either option. *See, e.g.*, C.J.C. 2.4(B) ("A judge shall not permit family . . . relationships to influence the judge's judicial conduct or judgment."); *see also* C.J.C., Terminology (defining "impartiality" as "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues that may come before a judge").

## B. Preservation

¶ 101　　In general, a defendant is required to object at trial to preserve an argument for appeal. *People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004). This is to give the court an opportunity to rule on the issue. *People v. Abu-Nantambu-El*, 2017 COA 154, ¶ 29. But a defendant waives a challenge for cause if counsel does not use reasonable diligence during jury selection to determine whether grounds for such a challenge exist. *People v. Romero*, 197 P.3d 302, 305 (Colo. App. 2008). In my view, defense counsel could not have done more to preserve this issue.

¶ 102　　True enough, during jury selection defense counsel was able to challenge the judge's wife for cause. But the statute authorizing such challenges does not include this very unusual situation. *See* § 16-10-103, C.R.S. 2017 (listing grounds to challenge prospective

54

jurors for cause). Thus, there was no statutory causal challenge to make or waive, and if the judge had denied counsel's challenge, counsel then risked alienating those jurors who might participate in the trial with the judge's wife. After all, the judge told everyone to accord his wife special treatment.

¶ 103 Defense counsel was also able to excuse the judge's wife by exercising a peremptory challenge. Counsel's exchange with the judge after the jury was selected suggests that he wanted to excuse the judge's wife but was afraid to do so. Counsel was undeniably "caught between a rock and a hard place," given the dilemma he faced. In seeking to make the trial fair by excusing the judge's wife, defense counsel risked alienating the judge who was charged with ensuring as much. As noted, the judge confirmed counsel was not "stupid" for leaving the judge's wife on the jury — and the judge thanked counsel for refraining from using any challenges on her.

## C. Discussion of the Error

¶ 104 In this case, (1) the judge's bias in favor of his wife prevented a fair assessment of her qualifications to serve as a juror and (2) his preference for her as a juror improperly affected the fairness of the trial.

¶ 105    From the outset of any criminal proceeding, the judge has a duty to ensure fairness and integrity of the trial.  This duty is the cornerstone of the constitutional framework that is designed to protect a criminal defendant's trial rights.  And, the Due Process Clauses of the United States and Colorado Constitutions guarantee every criminal defendant the right to a fair trial.  *See Morrison v. People,* 19 P.3d 668, 672 (Colo. 2000).

### 1.    Assessment of His Wife's Qualifications

¶ 106    Any inability of the trial judge to impartially assess the potential jurors directly infringes on a defendant's fair jury right. This is so because the judge is afforded considerable discretion in ruling on causal challenges predicated on actual bias.  *See People v. Clemens,* 2017 CO 89, ¶ 13 ("This standard gives deference to the trial court's assessment of the credibility of prospective jurors' responses, recognizes the trial court's unique role and perspective in evaluating the demeanor and body language of prospective jurors, and serves to discourage reviewing courts from second-guessing the trial court based on a cold record.").

¶ 107    In a similar vein, the prosecution and defense must be free to ask questions of potential jurors to reveal potential biases so that

56

the court may determine whether the prospective jurors are willing to follow the court's instructions and render a fair and impartial verdict based on the evidence. § 16-10-103(1)(j); *People v. Vigil*, 2015 COA 88M, ¶ 9. Counsel must also bring to the judge's attention those jurors who are not so willing. *See* Crim. P. 24(b)(2). I believe that without unhampered procedures, the foundation of a fair jury right cannot be secured.

¶ 108 In this case, the judge could not fulfill his role as a neutral arbiter in empaneling an impartial jury. Indeed, the judge determined in the absence of substantive questioning of his wife that she would make a fine juror. The judge made this determination despite his wife's expressed uncertainty in her jury questionnaire about whether she could be fair and whether she would be distracted.

¶ 109 The record shows that the judge's bias in favor of his wife had an ongoing chilling effect on defense counsel's willingness to challenge the judge's wife's serving on the jury. Unsurprisingly, counsel withheld any objections after being told by the judge that counsel was not stupid for being afraid to challenge the judge's wife.

### 2. The Judge's Preference for his Wife

¶ 110 The judge's exhibited bias in favor of his wife as a juror impacted the fairness of the trial beyond the jury selection process. The judge's wife was in a unique position to influence the other jurors during deliberation. *Elmore*, 144 S.W.3d at 280. The other jurors may have tended to give the deference to the judge's wife that they are presumed to give to the judge. The judge's comments throughout trial repeatedly underscored his and his wife's connection in the case and could have easily given other jurors the impression that they should afford his wife special favor and consideration during their deliberation.

### D. The Consequence

¶ 111 The consequence of the error does not fit into a nice construct.

### 1. Colorado Law

¶ 112 At a minimum, I conclude that under Colorado law the appearance of impropriety, which resulted from the judge's permitting his wife to serve on the jury in a case over which he presided, warranted reversal even without a showing of prejudice. *See Elmore*, 144 S.W.3d at 280; *Hartson*, 553 N.Y.S.2d at 539.

58

## 2. Structural Defect

¶ 113    I agree with the majority that this case does not fit into a category of structural defects as currently defined by the United States Supreme Court.

¶ 114    A deprivation of a constitutional right is a "structural defect affecting the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *see also Weaver v. Massachusetts*, 582 U.S. ___, ___, 137 S. Ct. 1899, 1907 (2017) (Structural errors are those that infringe on "certain basic, constitutional guarantees that should define the framework of any criminal trial."). Our supreme court has recognized several structural errors, including "complete deprivation of counsel, trial before a biased judge, unlawful exclusion of members of the defendant's race from a grand jury, denial of the right to self-representation, and denial of the right to a public trial." *Hagos v. People*, 2012 CO 63, ¶ 10. Of course, this case does not fall squarely into one of these categories because courts that have wrestled with judicial bias are confronted with situations where the judge has a direct, personal, or pecuniary interest in reaching a conclusion against or in favor of one of the parties. *See, e.g.,*

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009); *Tumey v. Ohio*, 273 U.S. 510 (1927). But the facts of this case lead me to conclude that the error improperly affected the structure of the trial itself.

¶ 115 Structural error is "so intrinsically harmful as to require automatic reversal." *Neder v. United States*, 527 U.S. 1, 7 (1999); *see also Blecha v. People*, 962 P.2d 931 (Colo. 1998). No "individualized analysis of how the error impairs the reliability of the judgment of conviction" is required. *Hagos*, ¶ 10.

¶ 116 The Supreme Court has recognized three broad rationales for why an error might be deemed structural: (1) if the "right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) if the effects of the error are too difficult to measure; or (3) if the "error always results in fundamental unfairness." *Weaver*, 582 U.S. at ___, 137 S. Ct. at 1908. I believe the facts of this case satisfy the second two of the *Weaver* rationales.

a. Effects Too Difficult to Measure

¶ 117 The effect of a judge's spouse serving on the jury is incalculable. *See Vasquez v. Hillery*, 474 U.S. 254, 263 (1986)

60

("[W]hen a petit jury has been selected upon improper criteria . . . , we have required reversal of the conviction because the effect of the violation cannot be ascertained.").

¶ 118 And, we cannot pry into what is said during deliberations, *see* CRE 606(b); *People v. Kriho*, 996 P.2d 158, 166 (Colo. App. 1999), and therefore cannot know the extent to which the judge's comments about his wife throughout the trial may have impacted the jury. As in *Elmore*, "other jurors would likely give more credence or weight to the judge's wife's views than the others on the panel." *Elmore*, 144 S.W.3d at 280; *see, e.g.*, *Starr v. United States*, 153 U.S. 614, 626 (1894) ("[T]he influence of the trial judge on the jury is necessarily and properly of great weight, and . . . his lightest word or intimation is received with deference, and may prove controlling.").

¶ 119 Statements like "[b]e nice to Juror 25" highlight the difficulty in measuring the effects of the error. The ability of one juror to improperly influence the decisions or opinions of others runs a high risk of partiality particularly where that juror is the subject of special treatment by the judge.

¶ 120    The effects of a single juror's ostensible authority, impressed on other jurors by the judge himself, are immeasurable. Her words and opinions might sway others during deliberations simply due to the imprimatur of the judge's preference for her. The effect is too difficult to measure and too far-reaching to ignore.

### b.    Result is Always Fundamentally Unfair

¶ 121    Our legislature has recognized that a person is presumptively biased toward his spouse. *See, e.g.*, § 16-10-103(1)(b) (relationship by marriage to an attorney engaged in the trial will sustain a for cause objection). Even if the judge made no comments about (and to) his wife, any knowledge of their spousal relationship by the attorneys or the other jurors was enough to vest his wife with unique status.

¶ 122    During voir dire, the judge is responsible for ensuring that an impartial jury is empaneled. This requires him or her to be free of bias toward the potential jurors. No judge can fairly and impartially determine the ability of his or her spouse to serve as a juror. Their spousal relationship imputes bias into the process itself — into the framework of the trial. Bias toward one's spouse prevents a judge

from fairly assessing that spouse as a juror, as the constitution requires of the judge.

¶ 123   The spousal relationship between the judge and his wife — coupled with his numerous comments about it — pervaded the trial from its very start.  Its presence was impossible for jurors to ignore. Any preference the judge has for a juror based on a spousal relationship undermines the very framework of a fair trial constitutionally guaranteed to a defendant.

## III.   Conclusion

¶ 124   Because I believe the judge committed reversible error by permitting his wife to serve on the jury over which he presided, I would reverse Richardson's judgment of conviction.  *See Elmore*, 144 S.W.3d at 280; *Hartson*, 553 N.Y.S.2d at 539. The lack of guidance for trial court judges confronted with a prospective juror being a close family member reinforces my hope that the legislature will address this in section 16-10-103 (providing grounds on which the court shall sustain a challenge for cause).