22CA1113 Peo v Menendez 11-20-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1113
City and County of Denver District Court No. 20CR3399
Honorable Edward D. Bronfin, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Allen J. Menendez,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MOULTRIE
Kuhn and Martinez*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 20, 2025

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Tanja Heggins, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    Defendant, Allen J. Menendez, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder.  We affirm.

I.    Background

¶ 2    In May 2020, an argument between Menendez and the victim, Paul Evans, escalated into a physical altercation in which Menendez stabbed and killed Evans.

¶ 3    The following factual background reflects the evidence that the jury heard at trial.

¶ 4    The altercation took place in an alley between businesses and residences.  Derek Robinson owned a business, the rear of which was adjacent to the alley.  Robinson said that the doors of his business were open the evening of the altercation, so he heard Menendez and Evans arguing in the alley.

¶ 5    After hearing what Robinson described as "elevated voices," he exited his business, went to a wooden fence[1] adjacent to the alley, and peered through a large hole in the fence to see what was going

---

[1] Robinson described having two fences between his business property and the alleyway: one wooden picket fence with a large hole in it and a second fence made of chain-link that bordered the alleyway.

on.  Robinson saw two men whom he recognized from the neighborhood in a "heated exchange" and "in very close proximity [to] each other."  At this point, he called 911 because Menendez and Evans "were on the ground having a bit of a tussle," and he "was concerned that there was a fight going on."  Robinson described Menendez as the aggressor in the altercation because he saw Menendez "attacking [Evans]."  However, Robinson didn't see either Menendez or Evans with a weapon while the men were fighting on the ground.  While Menendez and Evans fought, Robinson moved from the wooden picket fence to the chain-link fence to "get a better understanding of what [was] going on and [to] get a description of the people involved to the 911 operator."

¶ 6     Robinson said that the altercation ended with "[Evans] being stabbed," but he didn't see Menendez stab Evans.  By this time, Robinson was standing in between the wooden fence and chain-link fence and saw Menendez with a bloody knife in his hand.  And he recounted that Menendez looked him "squarely in the eye[s]" and said, "I stabbed that motherfucker."  After that encounter, Robinson watched Menendez walk north and enter the backyard of a residential property near Robinson's business.  Robinson knew the

2

neighbor who lived at the residential property that Menendez had entered. After hanging up with the 911 operator, Robinson called that neighbor, Catherine Mosely.

¶ 7    Mosely testified that Robinson called her the evening of the altercation and asked her to come outside because there had been a stabbing. Mosely said that she went outside and spoke with Robinson. She then went to her garage to check on her son, who was living with her, and saw that he and his friend, whom she knew as Jeff Menendez,[2] were in the garage smoking cigarettes. Based on her conversation with Robinson, Mosely believed police officers were looking for Menendez. However, when Mosely went into the alley to let police officers know that Menendez was in her garage, he fled, and the police were unable to detain him at that time.

¶ 8    Hours later, police officers on scene learned that Menendez had returned to the area where the altercation happened. Officer Sean McCandless and Officer Cameron Torrez canvassed the area, located Menendez, and arrested him.

---

[2] Defendant's full name is Allen Jeffrey Menendez.

3

¶ 9 Officer McCandless transported Menendez to jail in his patrol car, and Officer Torrez followed separately. Officer McCandless testified that Menendez was uncooperative during transport. And Officer Torrez recalled Menendez's combative behavior once the patrol car was parked in the jail's garage — such as screaming and kicking the patrol car's windows and partition. So that the officers could escort Menendez out of Officer McCandless's patrol car and into the jail, Officer Torrez attempted to calm down Menendez and build a rapport with him. During that interaction, Menendez told Officer Torrez, "I can't. I just killed someone."

¶ 10 The prosecution filed a complaint and information charging Menendez with first degree murder. Menendez didn't contest that he stabbed Evans, which resulted in Evans's death. Rather, he asserted self-defense as an affirmative defense. A jury found Menendez guilty of the lesser included offense of second degree murder.

¶ 11 Menendez now appeals his judgment of conviction and asserts that (1) the court erred when it took judicial notice of his in-court statements of guilt (prior statements); (2) there is insufficient evidence to sustain his conviction; (3) the prosecutor impermissibly

shifted the burden of proof during rebuttal closing argument; and

(4) cumulative error deprived him of a fair trial by an impartial jury.

We address each contention in turn.  Because we conclude there

was no reversible error, we affirm.

## II.    The Court Erred When It Took Judicial Notice of Menendez's Prior Statements, But the Error Was Harmless

### A.    Additional Background

¶ 12     A preliminary hearing occurred in June 2020.  Because the

hearing occurred at the height of the COVID-19 pandemic,

Menendez appeared in person with counsel, while the prosecutor

and the lead detective on the case, Detective Eric Bueno, appeared

virtually.  As a result, the parties and the court discussed how to

arrange various courtroom equipment so that those appearing

virtually could see those in person in the courtroom, and vice versa.

¶ 13     During the hearing, the prosecutor asked Detective Bueno to

identify the defendant in the courtroom.  While the court was

attempting to orient a courtroom camera toward defense counsel's

table before continuing with the detective's testimony, the following

exchange occurred:

> [COURT]:  Mr. Menendez just said, "I feel like
> this is a waste of time because I'm guilty of

5

this murder.  I don't know why we're doing this.  It's just a bunch of legalese."

Mr. Menendez, if you don't want to go forward with the preliminary hearing, you don't have to.  You can tell your attorneys that you want to plead guilty or do something else.  That's —

[MENENDEZ]:  I'm guilty.  I'm not looking for a deal either.  I want to be held accountable for what I did.

¶ 14    Menendez ultimately decided to go to trial.  At the end of the first day of trial, but outside the presence of the jury, the prosecution presented the court with an excerpt of the transcript from the preliminary hearing and requested the court to take judicial notice of Menendez's prior statements.

¶ 15    Defense counsel conceded that, "generally[,] . . . a defendant's statements in a criminal case can be admitted" but objected to the admission of the transcript because it would "mak[e] the Court a witness to th[e] case."  Defense counsel argued that the "only remedy would be for the Court to recuse itself so that [the defense] could then call the Court as a potential witness."  Defense counsel also argued that the transcript would "unfairly highlight[] that piece of evidence" for the jury, and the defense couldn't defend and

6

prepare a cross-examination of a witness — specifically, the court — if the transcript was admitted into evidence.

¶ 16    The prosecution argued that the certified copy of the transcript was self-authenticating under CRE 902(4).  The prosecution further argued that the prior statements were admissible as an admission by a party-opponent under CRE 801(d)(2).  The prosecution also argued that, because the transcript was a certified copy, the court wasn't a witness.

¶ 17    The court made the following preliminary findings of fact about the admissibility of Menendez's prior statements:

- Menendez's statements were volunteered and not in response to any question by defense counsel, the court, or anyone else.

- The transcript was a certified court record, which is no different than a transcript from a prior trial when the transcript could be used without calling the judge or the court reporter as a witness.

- Menendez's statements were an admission by a party-opponent.

- When a party makes a statement in court on the record, it's no different than a statement that a defendant might make during transport where there's no *Miranda*[3] issue.

¶ 18    After its findings, the court entered the following preliminary ruling:

> [G]iven [the transcript] is a certified document under seal, a court can take judicial notice under the rules of evidence and as an admission by Mr. Menendez[.]  I'm going to . . . redact[] the sentence, "I'm not looking for a deal either."  I'm going to allow in the statement, "I'm guilty.  I want to be held accountable for what I did."

The court further ruled that it wouldn't send the transcript back to the jury.  Instead, it would read Menenedez's prior statements to the jury.  The court concluded its preliminary ruling by stating that, "under [CRE] 201, taking judicial notice of a statement that was made and as part of the court record is appropriate because it's part of the certified court record."  However, the court reiterated that its ruling was only preliminary, and it would conduct further

---

[3] The court was referencing *Miranda v. Arizona*, 384 U.S. 436 (1966).

8

legal research and consider additional case law from counsel regarding the matter.

¶ 19     After the court made its preliminary ruling, defense counsel further objected and argued that Menendez's prior statements weren't subject to judicial notice "because a judicially noticed fact under [CRE] 201 must be one not subject to reasonable dispute, that is either generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Defense counsel also argued that, because Menendez wasn't under oath at the preliminary hearing, there was a distinction in this case from the example the court used regarding a transcript from a prior trial being admitted into evidence.

¶ 20     The following morning, again outside the presence of the jury, the court confirmed its preliminary ruling that it would take judicial notice of a portion of Menendez's prior statements.  In reaching its conclusion, the court reasoned, in part, that — unlike in *People v. Doyle*, 2015 CO 10 — it wasn't taking judicial notice of Menendez's guilt; rather, it was taking judicial notice of Menendez's statement of guilt.

¶ 21 During the trial, Menendez's prior statements were presented to the jury as follows:

> The court takes judicial notice of the following fact: During a hearing on June 23, 2020, Mr. Menendez made the following statement on the record, which was reported in a certified reporter's transcript.
>
> Quote, "I'm guilty, I want to be held accountable for what I did," close quote.
>
> A judicially noticed fact is one which the court determines is not subject to reasonable dispute and has been accepted as being true. You may or may not accept this fact as true. It is entirely your decision to determine what weight, if any, shall be given to the evidence.

¶ 22 The court also said that "implicit" in its ruling was that Menendez's prior statements were admissible as nonhearsay party-opponent admissions under CRE 801(d)(2). The court maintained its ruling that the transcript itself wouldn't be admitted as an exhibit that the jury would receive.

### B. Applicable Legal Principles

#### 1. CRE 201

¶ 23 CRE 201 governs a court's ability to take judicial notice of an adjudicative fact, which means the "fact must be one not subject to reasonable dispute" because "it is either (1) generally known within

10

the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." CRE 201(b). But in a criminal case, the court must "instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed." CRE 201(g). Rule 201 has "traditionally been used cautiously in keeping with its purpose to bypass the usual fact finding process only when the facts are of such common knowledge that they cannot reasonably be disputed." *Prestige Homes, Inc. v. Legouffe*, 658 P.2d 850, 853 (Colo. 1983).

¶ 24    While a court may judicially notice information in court records, "the mere reflection of an adjudicative fact in a court record in no way places the truth or accuracy of that fact beyond reasonable dispute, within the contemplation of Rule 201." *Doyle*, ¶ 11. Furthermore, "a court may not take judicial notice of facts on the very issue the parties are litigating." *Mun. Subdistrict, N. Colo. Water Conservancy Dist. v. OXY USA, Inc.*, 990 P.2d 701, 711 (Colo. 1999).

## 2.    CRE 801

¶ 25    "Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  An admission by a party-opponent is not considered a hearsay statement when, as relevant here, "[t]he statement is offered against a party" and "is . . . the party's own statement."  CRE 801(d)(2)(A).

## 3.    Standard of Review

¶ 26    We review a court's evidentiary rulings, such as a ruling on taking judicial notice pursuant to Rule 201, for an abuse of discretion.  *People v. Garrison*, 2017 COA 107, ¶ 30.  A trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair" or when it misapplies the law.  *People v. Payne*, 2019 COA 167, ¶ 5.  We review preserved nonconstitutional errors under a harmlessness standard, which means if we determine the court erred, we will reverse the judgment only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings."  *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

## C. Analysis

### 1. Menendez's Prior Statements Weren't Adjudicative Facts Subject to Judicial Notice

¶ 27 Menendez argues that the issue of whether he was guilty of the charges against him was subject to dispute; therefore, the court's judicial notice of his prior statements violated Rule 201. We agree.

¶ 28 Although the court discussed *Doyle* when deciding whether to take judicial notice of Menendez's prior statements, its ruling was inapposite to *Doyle*'s rationale. The fact that Menendez's statements appeared in a certified court record didn't "place[] the truth or accuracy of th[ose] fact[s] beyond reasonable dispute" under Rule 201. *Doyle,* ¶ 11. A criminal defendant is free to challenge the accuracy or adequacy of a fact that a court record purports to establish. Indeed, by claiming he acted in self-defense, challenging the prosecution's evidence, and presenting evidence of his own, Menendez challenged the accuracy of the statement that he was "guilty."

¶ 29 Consistent with Menendez's theory of the case, the jury was instructed on self-defense as an affirmative defense to first degree

murder and the lesser included offense of second degree murder. Thus, the prosecution was required to disprove self-defense. *See* § 18-1-407(2), C.R.S. 2025; *Castillo v. People*, 2018 CO 62, ¶ 39 ("When self-defense is an affirmative defense, . . . [d]isproving the existence of self-defense becomes an additional element of the offense that the prosecution has to disprove beyond a reasonable doubt."). We recognize that, in taking judicial notice of Menendez's prior statements, the court reasoned that it wasn't taking judicial notice of Menendez's guilt, but rather of the fact that Menendez stated in a prior hearing, "I'm guilty," and "I want to be held accountable for what I did." But by judicially noticing Menendez's statement that he was "guilty" — a statement that expressed a legal conclusion — and instructing the jury that the statement wasn't subject to reasonable dispute, the court came perilously close to expressing that the prosecution's burden had been met.

¶ 30 Thus, we conclude that the court abused its discretion when it judicially noticed Menendez's prior statements. However, as we discuss next, that error was harmless.

2.    Judicially Noticing the Prior Statements Was Harmless

¶ 31    The People assert that any error in taking judicial notice of the prior statements was harmless because the prior statements were (1) also admissible under CRE 801(d)(2)[4] and (2) cumulative of Menendez's admissions to two witnesses that he killed Evans.  We agree with the People that Menendez's prior statements were admissible under CRE 801(d)(2).[5]  *See People v. Dyer*, 2019 COA 161, ¶ 39.  Although the court primarily premised the admission of Menendez's prior statements on judicial notice, it also found that Menendez's statements were admissible as party-opponent admissions under CRE 801(d)(2).  Indeed, Menendez's defense counsel conceded as much during trial and doesn't argue otherwise on appeal.

_____

[4] The People also argue Menendez's prior statements were admissible because the transcript of the preliminary hearing was self-authenticating under CRE 902(4).  But the court explicitly refused to admit the transcript.  So we don't address this argument further.

[5] Because we agree that Menendez's prior statements were admissible under CRE 801(d)(2), we need not address the People's argument that they were also admissible under CRE 803(8)(A).  *See Mulberger v. People*, 2016 CO 10, ¶ 23 (Gabriel, J., concurring in the judgment).

15

¶ 32     We also agree with the People that Menendez's statements were cumulative of those he made to two witnesses. Robinson testified that Menendez, in reference to Evans, said that he "stabbed that motherfucker." And Officer Torrez testified that Menendez admitted that he "just killed someone." Menendez doesn't dispute he made those statements to Robinson and Officer Torrez.

¶ 33     Finally, we reject Menendez's assertion that the court's error in judicially noticing his prior statements wasn't harmless because the prosecution referenced the statements during its closing argument. Nowhere during its closing argument did the prosecution refer to the court's judicial notice of the statements or argue that the jury should determine Menendez's guilt because the court judicially noticed his prior statements; rather, the prosecution referenced the content of the prior statements themselves. Because we have concluded that Menendez's prior statements were admissible under Rule 801(d)(2) and were cumulative of undisputed statements he made to two testifying witnesses, we can't conclude that the court's error in judicially noticing the statements substantially influenced the verdict or affected the fairness of the trial proceedings. *See Hagos*, ¶ 12; *see also People v. Vanderpauye,*

16

2021 COA 121, ¶ 39 ("Whether an error is harmless depends on 'the overall strength of the state's case, . . . whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered.'" (citation omitted)), *aff'd*, 2023 CO 42.

### III. The Evidence Was Sufficient to Support the Conviction

#### A. Additional Background

¶ 34     In addition to Menendez's admissions to Robinson and Officer Torrez, the jury heard extensive testimony from Robinson in which he recounted seeing the altercation between Menendez and Evans. Robinson described to the jury that Menendez was on top of Evans during the altercation and that Menendez was the aggressor because he saw Menendez "attacking" Evans. Robinson also said that Menendez didn't appear afraid after he had stabbed Evans; rather, Menendez's demeanor was "more or less factual." Robinson also saw Menendez holding a bloody knife when he admitted to stabbing Evans.

¶ 35     Less than a month later, a crime scene investigator recovered from Mosely's backyard a bloody knife that contained Evans's DNA

17

on the blade. And the shoes Menendez was wearing the evening of the altercation came back positive for Evans's blood.

¶ 36 Detective Bueno testified at trial about surveillance video obtained from a neighboring business during the investigation. The video didn't have audio, nor did the camera angle capture the altercation. However, the video did show another part of the alleyway and a brief interaction between Robinson and Menendez. And Detective Bueno testified that the video showed Menendez dropping the knife, picking it back up, and walking toward Mosely's backyard.

¶ 37 The jury also heard from Mosely, who testified that when she saw Menendez in her garage with her son, the two were "just sitting there, talking, smoking cigarettes, [and] listening to music." She told Menendez to speak with police officers who were outside of her garage, and he replied that "he was going to smoke his cigarette . . . [b]ecause it was going to be awhile before he'd get to smoke another one." A police officer on the scene testified that when Mosely pointed out Menendez to the officers, he began to run through the house, and the officers were unable to detain him at that time.

¶ 38    The medical examiner testified that Evans was stabbed in the neck, underneath his chin.  The wound, which was nearly four inches long, extended through Evans's tongue, toward the back of his throat, and ended near his spine.

### B.    Applicable Legal Principles

#### 1.    Second Degree Murder and Self-Defense

¶ 39    A person commits the crime of second degree murder if the person "knowingly causes the death of a person."  § 18-3-103(1)(a), C.R.S. 2025.  A person acts "knowingly" with respect to a result of their conduct when they are aware that their conduct is "practically certain to cause the result."  § 18-1-501(6), C.R.S. 2025. "Second-degree murder, then, is a general intent crime which entails being aware that one's actions are practically certain to result in another's death."  *People v. Mingo*, 584 P.2d 632, 633 (Colo. 1978).  The prosecution must establish two factors in a second degree murder case: (1) death was more than merely a probable result of the defendant's actions, and (2) the defendant was aware of the circumstances that made death practically certain. *Id.*

¶ 40     A defendant's use of deadly physical force is lawful as self-defense only if they reasonably believe a lesser degree of force is inadequate and, as applicable here, have a reasonable ground to believe, and do believe, that they are "in imminent danger of being killed or of receiving great bodily injury." § 18-1-704(2)(a), C.R.S. 2025. Thus, the affirmative defense of self-defense considers both the actual belief of a defendant and whether a reasonable person would have believed and acted as the defendant did. *People v. Luna*, 2020 COA 123M, ¶ 26. To evaluate the reasonableness of a defendant's belief in the need to use deadly physical force, the jury must consider the totality of the circumstances. *People v. Chirico*, 2012 COA 16, ¶ 11.

¶ 41     When a defendant raises self-defense as an affirmative defense, "the guilt of the defendant must be established beyond a reasonable doubt as to that issue as well as all other elements of the offense." § 18-1-407(2); *Castillo*, ¶ 39. The prosecution can defeat an affirmative defense of self-defense in one of two ways: (1) by *disproving* beyond a reasonable doubt at least one of the two conditions of the defense or (2) by *proving* beyond a reasonable doubt that an exception to self-defense — such as the initial

20

aggressor exception — applies. *People v. Mosely*, 2021 CO 41, ¶ 18; *see also People v. Harrison*, 2020 CO 57, ¶ 34 (holding that the prosecution must disprove beyond a reasonable doubt at least one of the conditions of the affirmative defense of self-defense).

### 2. Sufficiency of the Evidence

¶ 42     "[T]he prosecution has the burden of establishing a prima facie case of guilt through introduction of sufficient evidence." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). On review, "[w]e consider 'whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt.'" *McCoy v. People*, 2019 CO 44, ¶ 63 (quoting *Clark*, 232 P.3d at 1291). However, "[w]e do not sit as a thirteenth juror to determine the weight of the evidence presented to the jury." *Clark*, 232 P.3d at 1293.

### 3. Standard of Review

¶ 43     We review sufficiency of the evidence claims de novo. *McCoy*, ¶ 63; *Maestas v. People*, 2019 CO 45, ¶ 13 ("[A] conviction that is based on legally insufficient evidence cannot stand.").

21

## C.    Analysis

¶ 44    Menendez argues that the evidence was insufficient to support a conviction for second degree murder for two reasons.  First, he contends that the prosecution failed to prove beyond a reasonable doubt that he knew his conduct was practically certain to cause death.  Second, he contends that the prosecution failed to defeat his claim of self-defense for three reasons: It didn't (1) disprove that he reasonably believed he needed to use physical force to defend himself against Evans's causing him imminent harm; (2) disprove that the degree of force he used was reasonable; and (3) prove that he was the initial aggressor in the altercation.

¶ 45    We aren't persuaded.

### 1.    The Evidence Was Sufficient to Prove Menendez Knew His Actions Were Practically Certain to Cause Evans's Death

¶ 46    Menendez argues that "[he] is not a physician," so "[h]e d[id] not know what he need[ed] to hit in the neck in order to make sure that he cause[d] death."  In support of this assertion, Menendez cites language in *Mingo* that says to prove second degree murder, the prosecution must establish that the victim's "death was more

22

than merely a probable result of [the] defendant's actions." 584 P.2d at 633. But *Mingo* undermines his argument.

¶ 47 In *Mingo*, the evidence demonstrated that the defendant was three feet away from the victim when she shot him in the chest and killed him. *Id.* The trial court refused to instruct the jury as to second degree murder, reasoning that such evidence was insufficient to prove beyond a reasonable doubt that the defendant knowingly caused the victim's death. The prosecution appealed and the supreme court reversed.

¶ 48 Noting that "subjective awareness of the probability of consequences is a matter which often must be inferred from [the] defendant's conduct and surrounding circumstances," the supreme court concluded that the evidence was sufficient to support a conviction for second degree murder because "it is obvious that a jury could reasonably conclude that discharging a gun from a distance of three feet creates such a high probability of death that death was practically certain, not merely a probable result." *Id.* at 634.

¶ 49 And a person doesn't need to be a physician to understand that stabbing someone in the neck is practically certain to cause

death. Indeed, Menendez acknowledges that it's a part of the body "that takes the same amount of force to cut through [as] a banana." Given the circumstances of the stabbing in this case, we determine that a jury could reasonably conclude that — by stabbing Evans in the neck, a part of the body that holds numerous vital arteries, and creating a nearly four-inch laceration that ended near Evans's spine — Menendez knew his actions were practically certain to cause Evans's death. *See id.*; *see also Mata-Medina v. People*, 71 P.3d 973, 984 (Colo. 2003) (concluding that the evidence was sufficient for the jury to find that the defendant was aware that striking the victim in the neck with his fists was practically certain to cause the victim's death).

### 2. The Evidence Was Sufficient to Disprove Menendez's Self-Defense Claim

¶ 50 We also reject Menendez's second contention that the prosecution failed to disprove beyond a reasonable doubt that Menendez acted in self-defense.

¶ 51 In support of his second contention, Menendez argues in part that, given the circumstances of the altercation, "[a] reasonable person would believe that unlawful physical force was imminent,"

and Menendez in fact reasonably believed that he needed to use physical force to defend himself from imminent unlawful physical force.

¶ 52    To evaluate the reasonableness of Menendez's belief that he needed to use deadly force against Evans, the jury was required to consider the totality of the circumstances. *Chirico*, ¶ 11. The circumstances of the altercation were presented to the jury through witness testimony, Menendez's prior statements and conduct after the altercation, and forensic evidence.

¶ 53    Robinson was the only witness who saw the altercation. Robinson testified that he saw Menendez on top of Evans, "physically attacking" Evans ; saw Evans "trying to defend himself . . . the best he could"; and observed Menendez's unafraid demeanor after the altercation. Additionally, Menendez told him, "I stabbed that motherfucker," while holding a bloody knife.

¶ 54    Robinson also said he perceived Menendez as the aggressor in the altercation. The jury submitted multiple questions during Robinson's testimony asking him about his recollection of the altercation. One of those questions asked Robinson how he knew Menendez was the aggressor. Robinson responded that his

25

perception was "[b]ased on what I could see, from my vantage point, at the back of the property," and he indicated that his view of the altercation wasn't obstructed.

¶ 55    The forensic evidence demonstrated that the laceration in Evans's neck from Menendez's knife was longer than the knife's blade and went through Evans's neck, ending near his spine. And despite being aware police were looking for him right after the altercation, Menendez fled. *People v. Summitt*, 132 P.3d 320, 324 (Colo. 2006) (holding evidence of flight and concealment to avoid arrest may be relevant to demonstrate a defendant's consciousness of guilt when a defendant was aware they were being sought by law enforcement).

¶ 56    It was up to the jury to assess the credibility and weight of the evidence presented to it. *See People v. Richardson*, 2018 COA 120, ¶ 13, *aff'd*, 2020 CO 46. There's no indication from the record that it didn't appropriately do so. Likewise, the jury was entitled to draw reasonable inferences from the evidence presented to it to determine whether the prosecution proved beyond a reasonable doubt all the elements of second degree murder, including the elements necessary to negate self-defense. *See id.*; *see also People v. Donald*,

2020 CO 24, ¶ 27 (noting jurors may draw reasonable inferences from both direct and circumstantial evidence).

¶ 57    In finding Menendez guilty of second degree murder, it's clear that the jury rejected Menendez's self-defense theory, which necessarily means that it found the prosecution disproved beyond a reasonable doubt at least one of the self-defense elements in the jury instruction. *See Mosely*, ¶ 2 ("[T]he jury need not unanimously agree on the specific reason that self-defense was disproven, so long as it unanimously agrees that the prosecution disproved self-defense beyond a reasonable doubt."). And the evidence described above, considered as a whole and in the light most favorable to the prosecution, supports the jury's verdict. Accordingly, we don't reach Menendez's remaining arguments because the prosecution didn't also need to disprove that the degree of force Menendez used was reasonable or, alternatively, prove that he was the initial aggressor in the altercation. *See id.* at ¶ 1 (holding that, to defeat an affirmative defense of self-defense, the prosecution must *either* disprove one of the two conditions of self-defense *or* prove that an exception to self-defense applies); *see also Mulberger v. People*, 2016 CO 10, ¶ 23 (Gabriel, J., concurring

in the judgment) (noting that the "cardinal principle of judicial restraint" is not deciding issues unnecessary to the resolution of the case (quoting *PDK Lab'ies Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))).

### IV. The Prosecutor Didn't Commit Prosecutorial Misconduct During Rebuttal Closing Argument

#### A. Additional Background

¶ 58 During closing argument, defense counsel reminded the jury that the burden was on the prosecution, not the defense.

¶ 59 Defense counsel argued that Menendez had "just been attacked by [Evans] potentially" and then said to the jury,

> The fact of the matter is you don't know who the aggressor was. You did hear some testimony that at one point [Robinson] was saying that [Menendez] was on top of [Evans]. You know what also makes sense with that is that [Evans] felt cornered, pulled out a knife, and that's how the knife got introduced into this situation.

¶ 60 Defense counsel also urged the jury to consider any evidence that was lacking or contradictory. As part of that argument, defense counsel said,

[The prosecution is] asking you to work backwards in this case, to obfuscate and cloud the fact that they have no evidence to present you the following information at the time that the stabbing occurred what [Menendez's] mental state was. Think about what evidence of this would look like. It would look like him saying, I'm going to kill this person, or, I want to kill this person, or even any kind of reason. To be clear, they don't have to prove motive. But a reason helps, right?

¶ 61    In its rebuttal, the prosecution argued,

[T]he way self-defense works is the [prosecution] only ha[s] to disprove one of [the two statutory factors] . . . . But here we have disproven both.

Because you have no evidence, none, other than speculation, other than sympathy of what the defendant was thinking . . . with respect to his belief that he had to use deadly physical force to defend himself. There is none. There is none.

He reasonably believed a lesser degree of force was inadequate. He had a reasonable ground to believe and did believe that he or another person was in imminent danger of being killed or receiving great bodily injury. None zero. Where would that evidence have come from?

When he walks out of the space behind the café with a knife in his hand, he turns to [Robinson] and what's the first thing he says? He attacked me. Help, oh my God, I just stabbed someone, but he attacked me first.

¶ 62     Defense counsel objected and argued that the prosecution was burden-shifting.  The court overruled the objection.

### B.     Applicable Legal Principles and Standard of Review

¶ 63     We evaluate a claim of prosecutorial misconduct during closing arguments "in the context of the argument as a whole and in light of the evidence before the jury." *People v. McMinn*, 2013 COA 94, ¶ 60.  "In doing so, we recognize that prosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel." *Id.*  And the prosecution's closing argument "may properly include the facts in evidence and any reasonable inferences drawn therefrom." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005).

¶ 64     While it's "improper for a prosecutor to shift the burden of proving innocence to a defendant," *People v. Duncan*, 2023 COA 122, ¶ 32, "[a] prosecutor's burden-shifting actions fall on a spectrum," *People v. Santana*, 255 P.3d 1126, 1131 (Colo. 2011).  If a prosecutor explicitly argues that a defendant must prove their innocence, then they have indeed engaged in burden-shifting.  *See Santana*, 255 P.3d at 1131.  Conversely, a prosecutor's actions that "only tangentially and weakly imply [that] the defendant bears the

burden of proof[] carry[] little to no danger the jury will place the burden of proof on the defendant." *Id.*

¶ 65　To determine whether the prosecution has improperly shifted the burden of proof, we view the entire record and consider to what extent

> (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions constituted a fair response to the questioning and comments of defense counsel; and (3) the jury is informed by counsel and the court about the defendant's presumption of innocence and the prosecution's burden of proof.

*Id.* at 1131-32 (footnotes omitted).

¶ 66　Furthermore, because "[t]he scope of closing argument rests in the sound discretion of the trial court," we won't disturb the court's ruling "absent a gross abuse of discretion" resulting in prejudice to the defendant. *People v. Bowles*, 226 P.3d 1125, 1132 (Colo. App. 2009). We review a preserved objection that the prosecution's argument lowered its burden of proof for constitutional harmlessness. *See People v. Cuellar*, 2023 COA 20, ¶ 62.

## C. Analysis

¶ 67    Menendez argues that the prosecution suggested in its rebuttal closing argument that Menendez had an obligation to present evidence in support of his theory of self-defense and that it didn't have the burden to disprove the affirmative defense of self-defense. We aren't persuaded.

¶ 68    Prosecutors are afforded "'wide latitude in the language and presentation style used' during closing argument," which "is especially true when a prosecutor is responding to defense counsel's closing argument." *People v. Tran,* 2020 COA 99, ¶ 58 (quoting *Domingo-Gomez,* 125 P.3d at 1048).

¶ 69    Although the prosecutor's comments implied that there was no evidence to support Menendez's theory of self-defense, the prosecution's rebuttal closing argument, when considered in context of the entire record, responded to defense counsel's hypothetical arguments about what caused the altercation and Menendez's state of mind during it. *See Santana,* 255 P.3d at 1131-32

¶ 70    For example, none of the witnesses' testimony or the admitted evidence suggested that Evans "felt cornered" or that he, rather

than Menendez, introduced the knife into the altercation. Thus, it wasn't burden-shifting when the prosecution responded to defense counsel's hypotheticals by stating that there was no evidence to support them. *See id.* at 1132 ("[B]y considering the strength of the burden-shifting actions in light of the whole record, we protect a prosecutor's ability to 'comment on the lack of evidence confirming [a] defendant's theory of the case.'" (citation omitted)). Likewise, because defense counsel argued that there was no evidence of the types of statements by Menendez that would negate self-defense, it wasn't improper for the prosecution to argue in response that there were also no statements that would support self-defense.

¶ 71　　We therefore can't conclude that the prosecutor's conduct improperly shifted the burden to Menendez or that the court abused its discretion by overruling defense counsel's objection to the prosecution's rebuttal closing argument because our review of the entire record demonstrates that the prosecutor was responding to defense counsel's arguments.

¶ 72　　Because we have concluded that the prosecutor's conduct here didn't improperly shift the burden, we need not address whether

the conduct warranted reversal.  *See People v. Robinson*, 2019 CO 102, ¶ 18.

## V.     There Is No Cumulative Error

¶ 73    Finally, Menendez argues that reversal is warranted under the cumulative error doctrine.  Because we've identified only one harmless error, we need not conduct a cumulative error analysis. *See People v. Conyac*, 2014 COA 8M, ¶ 152 ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VI.   Disposition

¶ 74    The judgment is affirmed.

JUDGE KUHN and JUSTICE MARTINEZ concur.